## APPEAL OF FEDERAL PLATE GLASS CO.

Docket No. 1055.  Promulgated March 2, 1927.

1. Value of mineral lands acquired in 1905 in exchange for shares of stock determined.

2. Certain amounts paid to employees in addition to stated salaries *held* to be capital expenditures.

3. Claim for deduction on account of extraordinary repairs of manufacturing equipment disallowed as deduction from gross income.

*Albert L. Hopkins, Esq., Richard S. Doyle, Esq.,* and *F. D. Utley, C. P. A.,* for the petitioner.

*M. N. Fisher, Esq.,* for the Commissioner.

This is an appeal from the determination of deficiencies in income and profits taxes for the year 1918, the year 1919, and January and February of the year 1920, in the respective amounts of $15,535.08, $18,443.48, and $5,409.50, or a total of $39,388.06. The issues are: (1) The value, for statutory invested capital purposes, of certain silica sand-bearing lands acquired by the petitioner in 1905; (2) the petitioner's right to include in its statutory invested capital the amount of $100,000 paid, in addition to stated salaries, to two men employed during and after the construction of the petitioner's manufacturing plant; and (3) whether the petitioner properly deducted from its gross income for January and February, 1920, a certain amount alleged to have been incurred as ordinary and necessary expenses incident to the operation of its business during that period. The petitioner abandoned a fourth issue relating to the value of its mineral deposits at March 1, 1913, as a basis for the computation of annual deductions for depletion, and such issue, by order of the Board dated July 6, 1925, was eliminated from consideration in the determination of the appeal.

### FINDINGS OF FACT.

The petitioner is an Illinois corporation organized in 1905, with its principal office at Ottawa, where it is engaged in the mining of silica and other sands, and in the manufacture and sale of plate glass.

At the date of incorporation the petitioner issued all its authorized capital stock, in the amount of $1,000,000 par value, in exchange for the tangible property of the Great Western Glass Co. Among the assets so acquired were two tracts of white silica sand-bearing lands of 38 acres and 5 acres, respectively, and a contract with the

Ottawa Development Association for the acquisition of an additional tract of 30 acres of such land contingent on certain conditions which were afterwards performed by it and title to such acreage thereby secured. A partly completed plate glass manufacturing plant was located on the 38-acre tract. The total extent of silica sand-bearing lands thus acquired was 73 acres, of which an area of 20 acres was used for the site of the petitioner's manufacturing plant.

Prior to the beginning of operations by the petitioner, the Chicago, Rock Island & Pacific Railroad and the Chicago, Burlington & Quincy Railroad had constructed a joint switch track or spur through the lands owned by the petitioner and others, north of the Illinois River and connecting the petitioner's plant both with some of the main silica deposits and the main line of the railroads.

The principal known and developed deposits of silica sand in the United States east of the Rocky Mountains which are suitable for the manufacture of glass, other than those near Ottawa, Illinois, are in Pennsylvania, West Virginia, Kentucky, Missouri, Ohio, and Michigan. The silica sand in the Ottawa district is a high grade white sand and well suited for the manufacture of plate glass, table glass, crystal, and the finest grades of glassware. A chemical analysis shows it to run as high as 99.89 per cent pure silica, after being washed, dried, and screened. It is readily accessible, at some points being entirely exposed, and at other places covered with a relatively slight overburden of foreign deposit which can be removed by scraping and brushing. The silica sand occurs in a formation, known as St. Peter's sandstone, which is so soft that much of it can be mined with steam shovels, but it is necessary to blast some of the rock loose and in other cases to wash it down from the pit margins by hydraulic process. After being loosened by one of these methods the sand is pumped from the sump at the bottom of the pit to the factory or the cars. The usual depth of mining is from 60 to 65 feet. Below that depth water seepage interferes with the mining and the cost of elevating the sand to the surface increases considerably.

The silica deposits in the other States above mentioned, and other deposits in Illinois, are not so cheaply recoverable or so economically usable as those of the Ottawa district, due to various conditions, some of them being the heavy overburden covering the sand, the hardness of the sand-bearing rock, the color of the sand and impurities in it such as lime and clay. Where sand occurs in a hard rock formation it is first blasted, then crushed in rock crushers, and put through what is known as a chaser mill in order to separate the grains of sand. Sand that is not pure white is not suitable for high grade glassware. Where lime occurs in sand it is necessary that it be burned out be-

fore the sand can be used to manufacture glass. Other impurities must be removed by the use of chemicals.

Silica sand, used in glass making, is either "batch" sand or "grinding" sand. Batch sand is used in the making of the glass and must be washed, dried and screened so as to be entirely free of foreign matter before it is suitable for that purpose. Plate glass, as it is originally cast, is about five-eighths of an inch thick. After being run through the cooling ovens, or lehrs, it is imbedded in plaster of Paris on a cast iron table 25 feet in diameter, which revolves under a grinding machine. In the latter process the grinding sand is used, being circulated on the surface of the glass by means of cast iron runner bars. After one side of the glass is polished, the plate is turned over and the other side put through the same process. From five to seven grades of sand are used in grinding each side of the glass, the coarsest sand being used first. It requires about three times as much sand for grinding glass as is used in the making of it.

The petitioner purchased its batch sand from the Ottawa Silica Co., which was engaged in the production of silica sand and had extensive holdings of sand-bearing lands within a mile of the petitioner's factory. Both the Ottawa Silica Co.'s land and the petitioner's factory were on the railroad switch track above mentioned. The sand was purchased by the petitioner under contract at 65 cents per ton f. o. b. cars. During the same period the Ottawa Silica Co. sold sand to others at prices ranging from 75 cents to $3.50 a ton. If the petitioner had purchased grinding sand, it would have cost, including transportation from the nearest point of production, about $1 per ton. The grinding sand used by the petitioner was produced by it from its own land.

Prior to the organization of the petitioner corporation, a glass manufacturing company at Saginaw, Mich., had purchased batch sand from the Ottawa Silica Co. at 75 cents per ton f. o. b. Ottawa. The freight to Saginaw amounted to $1.75 per ton, making the cost $2.50 per ton delivered on cars. The cost of unloading was about 10 cents per ton. That company procured its grinding sand from a deposit about twenty miles from the factory at a cost of $1 to $1.25 per ton.

About the years 1898 and 1899, the Ottawa Development Association purchased from individuals several hundred acres of silica-bearing land, including the tracts in question, near Ottawa, at prices ranging from $60 to $125 per acre. This land was acquired for the purpose of offering it to manufacturers to induce them to locate their plants in that locality. Sales of similar land were made by individuals between 1900 and 1912 at prices ranging from $125 to $300 per acre.

About 1893 another firm was engaged in the production and shipment of silica sand from the Wedron silica fields, about eight miles from the Ottawa fields. It sold its sand on a royalty basis of 6 cents per ton and taxes. That royalty was paid under a ten-year contract, and, upon the expiration of that contract, it was renewed on the basis of 5 cents per ton and taxes. The Wedron silica is of the same general character and suitable for the same purposes as the Ottawa silica. The Wedron district is served by the Chicago, Burlington & Quincy Railroad.

The cash value of the factory site and silica-bearing lands acquired by the petitioner in 1905 in exchange for stock was $35,000.

Early in 1907, the petitioner by oral agreement secured the services of E. F. Achard and one Dittman, who theretofore had been employed by the Saginaw Plate Glass Co., and agreed to pay therefor annual stated salaries and certain shares of its capital stock. After some months it was unable to make delivery of the stock, and thereafter it entered into written agreements with Achard and Dittman, whereby the former was employed as general manager, and the latter in some capacity not disclosed by the record, but apparently as plant superintendent, at the previously agreed respective annual salaries of $8,500 and $5,000. In addition to such stated salaries, each was to receive $50,000 in cash, to be paid in annual installments of 7½ per cent of the net earnings of the petitioner, but with the provision that no payment on this account to either of them for any one year was to be less than $2,500. This agreement was made on November 4, 1908, but was effective as of January 1 of that year, and all payments in addition to stated salaries were completed by some time in the year 1917. The amounts so paid were not entered on the petitioner's books as capital items, but were charged to operating expense from year to year.

At the date of the oral agreement of employment, Dittman began work for the petitioner, but Achard remained at Saginaw, Mich., for several months thereafter. When Achard and Dittman were employed by the petitioner, the plant at Ottawa was nearing completion. Under the direction of these men some changes were made in the construction of the plant and in the machinery, some of which had been purchased and installed and some contracted for; additional machinery was purchased and installed; two extra furnaces were constructed, and the first glass was cast in February, 1908. Achard remained in the employ of the petitioner as general manager from 1907 to December 31, 1919. Dittman remained at Ottawa for about eight years, then went to Europe, and later returned. During his absence payments to him under the contract were continued.

The lehrs, or cooling ovens, upon which the petitioner claims depreciation, consist of five ovens and a runway about 80 feet in

length. Plate glass is first cast on a casting table, where it is rolled to a thickness of about five-eighths of an inch. It is then placed in the first of the cooling ovens which has a temperature of about 1260 degrees; it is next stowed into the second oven which has a temperature of about 1120 degrees, and from there it is carried through the remaining ovens, finally reaching the runway of the lehr. By the time the glass reaches the end of the runway it is cooled and is then cut and put in stock and later polished.

On account of the wear and tear resulting from use under the extremely high temperature the lehrs used by the petitioner were torn down approximately once in every twelve months and extensive repairs made at a cost of at least $24,000. Minor repairs were frequently made to maintain the lehrs in an operating condition, and during the two-month period such repairs were made. A deduction on account of the exhaustion of the plant, machinery, and equipment was allowed.

For the years prior to 1920 the petitioner charged to expense the cost of the annual repairs to the lehrs. It disposed of its plant as of March 1, 1920, and claims the right to a deduction of $2,000 for each of the months of January and February, 1920, as representing expense of repairing the lehrs for that period.

## OPINION.

LANSDON: There are three questions in this appeal for our consideration, viz: (1) The value, for statutory invested capital purposes, of the silica sand-bearing lands acquired by the petitioner in 1905 in exchange for stock; (2) whether the amount of $100,000 which the petitioner paid to two of its employees in addition to stated salaries may be included in the computation of its statutory invested capital; and, (3) whether the amount of $4,000 may be deducted from the petitioner's gross income for the months of January and February, 1920, as ordinary and necessary expense of operating its business. We shall discuss and decide these issues in the order named.

The law provides that the cash value of tangible property *bona fide* paid in for stock shall be included in the computation of invested capital for profits tax purposes. Although legal title to a part of the silica sand-bearing lands involved in this appeal was not acquired by the petitioner at the date of organization, it appears that a contract, which later was fully complied with, providing for such part of the land, was included in the assets for which stock was issued in 1905. We shall assume, therefore, that the beneficial ownership of the entire 73 acres, described in our findings of fact,

was in the petitioner from 1905, and our problem here is to ascertain the cash value of such land at that date.

The Commissioner and the petitioner are very far apart in their estimates of value of the lands which the petitioner purchased with stock in 1905. The Commissioner asserts that the lands then and so acquired had a cash value of not more than $14,735. The petitioner contends that the value of the factory site and the silica sand deposits in such land at date of acquisition was at least $550,000. It is obvious that such widely divergent results must have been reached by wholly irreconcilable methods. The Commissioner has determined the cash value of the land as indicated by actual sales of such property in the immediate vicinity, both before and after the date of the transaction here in question. The petitioner has computed what it alleges was the cash value of the recoverable mineral deposits in the land.

The evidence is conclusive that the silica sand deposits contained within the land in question have a very substantial value because of their purity; their accessibility to the petitioner's manufacturing plant; their location on the switch tracks of two great trunk line railroads; and the low operating expense of their recovery. There is no proof, however, that these deposits are unique in any of these respects. They are a part of a geological formation that underlies a considerable area of the State of Illinois. They are only a small part of such formation in the immediate vicinity. There are other deposits of high grade silica sand which have been developed in many sections of the country, and especially in Pennsylvania, West Virginia, Ohio, and Missouri, where they are so abundant that their exhaustion is likely to be a matter of centuries. That the deposits in question are not essential to the operation of the petitioner, and are regarded as a reserve against future requirements rather than a source of current supply, is indicated by the fact that all the silica sand used by the petitioner in its operations for many years was purchased from another company operating mines in the same locality.

The valuation of approximately $10,000 per acre contended for by the petitioner rests solely on the opinion of three witnesses, all of whom are familiar with silica sand deposits, and with the processes of converting that mineral into glass. These witnesses agree that each acre of the petitioner's land contains a minimum of 100,000 tons of recoverable silica sand, and that such sand had a cash value in place of at least 10 cents a ton when acquired in 1905. This testimony is not convincing as to the question at issue. We are concerned only with the cash value of the lands at the date of their exchange for stock. If cash value exists in any asset it is measur-

able by the amount of cash into which it can be converted by a transaction of sale and purchase between two parties, each of whom is perfectly free to act for his own best interests.

There is no evidence in the record of any sale of silica sand-bearing lands such as were owned by the petitioner at a price based on the high value here asserted. Neither the petitioner nor any other manufacturer of glass has testified that it has ever paid or considered the payment of $10,000 an acre for such land. No witness has testified that any such lands at Ottawa, or at any other place in the United States, have ever been sold for a price based on even a tithe of such value. On the other hand, it is in evidence that a large tract of silica lands, including the very acreage in question, was acquired by the Ottawa Development Association about the year 1899 for prices varying from $60 to $125 per acre, and were afterwards sold at prices that in no instance exceeded $300 per acre. The sales of several tracts of such lands, some of them to this petitioner, are of record between 1905 and 1912, and, in each transaction, the price was under $500 per acre. It is argued by the petitioner that, as the Ottawa Development Association was a non-profit organization, the prices at which it bought and sold are not criteria of cash or market value. This may be true of its sales, but not of its purchases, which, we may assume, were at market prices, or even higher, since its purpose was not to earn profits, but to advance the interests of the community. There is no evidence that sales of silica sand-bearing lands made by private parties in the neighborhood at prices never in excess of $300 per acre were not transactions on an open market between willing sellers and willing purchasers. Giving due consideration to all the very substantial advantages resulting to the petitioner from the ownership of these lands, we are of the opinion that their cash value at date of acquisition was not more than $35,000.

The petitioner also contends that the amount of $100,000 which it paid to its general manager and plant superintendent in addition to stated salaries shall be included in its statutory invested capital. To sustain its contention on this point it asserts that these men performed services in the completion of its manufacturing plant analogous to the duties and functions of designing and supervising architects or engineers, and that the result of such services is reflected in its capital assets. The evidence is clear that for some time prior to the beginning of production, Achard and Dittman redesigned some of the plant buildings which were subsequently reconstructed under their supervision; that they supervised the purchase and installation of much of the equipment of the plant. It was largely through their supervision and direction that the plant was made ready for production. To secure the services of these men for the purposes

here indicated, the petitioner paid each of them the amount of $50,000, which was in addition to remuneration for services connected with the operation of the enterprise. We are of the opinion that these payments were capital expenditures and should be included in the computation of the petitioner's invested capital for profits-tax purposes in each of the taxable years.

It does not appear from the evidence that the petitioner incurred any expense in the repair of its cooling ovens in January and February, 1920. It contends, however, that such cost would have been necessary for the year 1920 in the amount of $24,000, or at the rate of $2,000 monthly, and apparently, on the theory that the need of such repairs had accrued at the end of February in the amount of $4,000, asks for the deduction thereof from its gross income for that period. There is no authority in the Revenue Act applicable here for the deduction from gross income of operating expenses until they are incurred and paid or accrued. The amount of $4,000 here in question was not paid during the taxable period, and there is no convincing evidence that it was either incurred or accrued. It is disallowed as a deduction from gross income from that period.

*Judgment will be entered on 10 days' notice, under Rule 50.*

ARUNDELL and MILLIKEN not participating.

TRAMMELL dissents on the first point.