*355 OPINION.
Lansdon:
There are three questions in this appeal for our consideration, viz: (1) The value, for statutory invested capital purposes, of the silica sand-bearing lands acquired by the petitioner in 1905 in exchange for stock; (2) whether the amount of $100,000 which the petitioner paid to two of its employees in addition to stated salaries may be included in the computation of its statutory invested capital; and, (3) whether the amount of $4,000 may be deducted from the petitioner’s gross income for the months of January and February, 1920, as ordinary and necessary expense of operating its business. We shall discuss and decide these issues in the order named.
The law provides that the cash value of tangible property tona fide paid in for stock shall be included in the computation of invested capital for profits tax purposes. Although legal title to a part of the silica sand-bearing lands involved in this appeal was not acquired by the petitioner at the date of organization, it appears that a contract, which later was fully complied with, providing for such part of the land, was included in the assets for which stock was issued in 1905. We shall assume, therefore, that the beneficial ownership of the entire 73 acres, described in our findings of fact, *356 was in the petitioner from 1905, and our problem here is to ascertain the cash value of such land at that date.
The Commissioner and the petitioner are very far apart in their estimates of value of the lands which the petitioner purchased with stock in 1905. The Commissioner asserts that the lands then and so acquired had a cash value of not more than $14,735. The petitioner contends that the value of the factory site and the silica sand deposits in such land at date of acquisition was at least $550,000. It is obvious that such widely divergent results must have been reached by wholly irreconcilable methods. The Commissioner has determined the cash value of the land as indicated by actual sales of such property in the immediate vicinity, both before and after the date of the transaction here in question. The .petitioner has computed what it alleges was the cash value of the recoverable mineral deposits in the land. •
The evidence is conclusive that the silica sand deposits contained within the land in question have a very substantial value because of their purity; their accessibility.to the petitioner’s manufacturing-plant; their location on the switch-tracks of two great trunk line railroads; and the low operating expense of their recovery. There is no proof, however, that these deposits are unique in any of these respects. They are a part of a geological formation that underlies a considerable area of the State of Illinois. They are only a small part of such formation in the immediate vicinity. There are other deposits of high grade silica sand which have been developed in many sections of the country, and especially in Pennsylvania, West Virginia, Ohio, and Missouri, where they are so abundant that their exhaustion is likely to be a matter of centuries. That the deposits in question are not essential to the operation of the petitioner, and are regarded as a reserve against future requirements rather than a source of current supply, is indicated by the fact that all the silica sand used by the petitioner in its operations for many years was purchased from another company operating mines in the same locality.
The valuation of approximately $10,000 per. acre contended for by the petitioner rests solely on the opinion of three witnesses, all of whom are familiar with silica sand deposits, and with the processes of converting that mineral into glass. These witnesses agree that each acre of the petitioner’s land contains a minimum of 100,000 tons of recoverable silica sand, and that such sand had a cash value in place of at least 10 cents a ton when acquired in 1905. This testimony is not convincing as to the qilestion at issue. We are concerned only with the cash value of the lands at the date of their exchange for stock. If cash value exists in any asset it is measur *357 able by the amount of cash into which it can be converted by a transaction of sale and purchase between two parties, each of whom is perfectly free to act for his own best interests.
There is no evidence in the record of any sale of silica sand-bearing lands such as were owned by the petitioner at a price based on the high value here asserted. Neither the petitioner nor any other manufacturer of glass has testified that it has ever paid or considered the payment of $10,000 an acre for such land. No witness has testified that any such lands at Ottawa, or at any other place in the United States, have ever been sold for a price based on even a tithe of such value. On the other hand, it is in evidence that a large tract of silica lands, including the very acreage in question, was acquired by the Ottawa Development Association about the year 1899 for prices varying from $60 to $125 per acre, and were after-wards sold at prices that in no instance exceeded $300 per acre. The sales of several tracts of such lands, some of them to this petitioner, are of record between 1905 and 1912, and, in each transaction, the price was under $500 per acre. It is argued by the petitioner that, as the Ottawa Development Association was a non-profit organization, the prices at which it bought and sold arc not criteria of cash or market value. This may be true of its sales, but not of its purchases, which, we may assume, were at market prices, or even higher, since its purpose was not to earn profits, but to advance the interests of the community. There is no evidence that sales of silica sand-bearing lands made by private parties in the neighborhood at prices never in excess of $300 per acre were not transactions on an open market between willing sellers and willing purchasers. Giving due consideration to all the very substantial advantages resulting to the petitioner from the ownership of these lands, we are of the opinion that their cash value at date of acquisition was not more than $35,000.
The petitioner also contends that the amount of $100,000 which it paid to its general manager and plant superintendent in addition to stated salaries shall be included in its statutory invested capital. To sustain its contention on this point it asserts that these men performed services in the completion of its manufacturing plant analogous to the duties and functions of designing and supervising architects or engineers, and that the result of such services is reflected in its capital assets. The evidence is clear that for some time prior to the beginning of production, Achard and Dittman redesigned some of the plant buildings which were subsequently reconstructed under their supervision; that they supervised the purchase and installation of much of the equipment of the plant. It was largely through their supervision and direction that the plant was made ready for production. To secure the services of these men for the purposes *358 here indicated, the petitioner paid each of them the amount of $50,000, which was in addition to remuneration for services connected with the operation of the enterprise. We are of the opinion that these payments were capital expenditures and should be included in the computation of the petitioner’s invested capital for profits-tax purposes in each of the taxable years.
It does not appear from the evidence that the petitioner incurred any expense in the repair of its cooling ovens in January and February, 1920. It contends, however, that such cost would have been necessary for the year 1920 in the amount of $24,000, or at the rate of $2,000 monthly, and apparently, on the theory that the need of such repairs had accrued at the end of February in the amount of $4,000, asks for the deduction thereof from its gross income for that period. There is no authority in the Revenue Act applicable here for the deduction from gross income of operating expenses until they are incurred and paid or accrued. The amount of $4,000 here in question was not paid during the taxable period, and there is no convincing evidence that it was either incurred or accrued. It is disallowed as a deduction from gross income from that period.
Judgment will be entered on 10 days' notice, under Rule B0.
A rúndele and Millticen not participating.
Trammell dissents on the first point.